UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

| | |
|---|---|
| DALE MILLER and JOHN F. BARTON, JR., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>METROPOLITAN LIFE INSURANCE COMPANY, a New York Corporation; and DOES 1-10, inclusive,<br><br>Defendants. | Case No.: 17-cv-7284 (AT) (SN)<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>1. **BREACH OF CONTRACT**<br><br>2. **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING  (CONTRACTUAL)**<br><br>3. **BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING  (TORTIOUS)**<br><br>4. **NEGLIGENCE**<br><br>**JURY TRIAL DEMANDED** |

------------------------------------------------------------x

Plaintiffs DALE MILLER ("MR. MILLER") and JOHN F. BARTON, JR. ("MR. BARTON"), on behalf of themselves and all others similarly situated, allege the following:

## JURISDICTION AND VENUE

1. This Court has diversity jurisdiction over this class action pursuant to 28 U.S.C. § 1332 as amended by the Class Action Fairness Act of 2005 because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which some members of the class are citizens of different states than the Defendants. *See* 28 U.S.C. § 1332(d)(2)(A).

2. This Court also has personal jurisdiction over Defendants because Defendants are authorized to do business, and currently do business, in this state.

3. Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391 because Defendant METROPOLITAN LIFE INSURANCE COMPANY (hereafter, referred to as "METLIFE") has conducted business in this District and is subject to personal jurisdiction and a substantial portion of the conduct complained of herein occurred in this District.

## PARTIES

4. Plaintiff, MR. MILLER, at all relevant times herein, was and is a citizen and resident of the State of California. MR. MILLER entered into a contract with METLIFE on or about March 22, 2000, when he accepted METLIFE's offer for a Group Variable Universal Life (GVUL) policy.

5. Plaintiff, MR. BARTON, at all relevant times herein, was and is a citizen and resident of the State of Colorado. MR. BARTON entered into a contract with METLIFE in or about March 2000, when he accepted METLIFE's offer for a GVUL policy.

6.     Defendant METLIFE is a New York corporation, with its corporate headquarters located in the State of New York. METLIFE also conducts a substantial amount of business nationwide.

7.     Plaintiffs are unaware of the true names and capacity of the defendants sued as DOES 1-10, and therefore sue these defendants by fictitious names. Plaintiffs will seek leave to amend this Complaint when and if the true identities of these DOE defendants are discovered. Plaintiffs are informed and believe and thereon allege that each of the defendants designated as a DOE is responsible in some manner for the acts and occurrences alleged herein, whether such acts or occurrences were committed intentionally, negligently, recklessly or otherwise, and that each said DOE defendant thereby proximately caused injuries and damages to Plaintiffs and the Class as herein alleged, and is thus liable for Plaintiffs' and the Class's injuries.

8.     At all times herein mentioned, Defendants, and each of them, were the agents, principals, servants, employees, and subsidiaries of each of the remaining Defendants, and were at all times acting within the purpose and scope of such agency, service, and employment, and directed, consented, ratified, permitted, encouraged, and approved the acts of each remaining defendant.

## **PRELIMINARY ALLEGATIONS**

9.     This action arises out of METLIFE's practice of improperly charging certain of their non-smoking insureds smoker rates, which are higher than non-smoker rates, for their life insurance premiums, when the insureds did not enroll in the life insurance policies as smokers, and no express terms in their contracts with METLIFE provide they are smokers who may be charged smoker rates.

10. MR. MILLER is currently a commercial airline pilot with United Airlines ("United"), and he has been employed as a pilot with United since 1990. MR. MILLER is also a member of the Airline Pilots Association (hereafter "ALPA"), the union for airline pilots with United.

11. As a pilot with United, MR. MILLER received several employee benefits including group rates on insurance services being offered by METLIFE. MR. MILLER has taken advantage of these benefits since after he first became employed with United in 1990 and has maintained some form of life insurance with METLIFE, throughout his employment there.

12. When MR. MILLER first enrolled for life insurance services with METLIFE, he was enrolled in either an Optional Term Life insurance (OTL) program or a Group Universal Life policy (GUL) program. MR. MILLER never indicated to METLIFE in any form that he was a smoker, and never agreed to any contractual term designating him as a smoker who may be charged smoker rates, because MR. MILLER has always been a non-smoker during the applicable periods, including the five-year look back periods.

13. In or about March of 2000, MR. MILLER was informed that his life insurance policy with METLIFE would be changing from the OTL or GUL policy, to a GVUL policy.

14. On or about March 15, 2000, MR. MILLER completed a Group Variable Universal Life Special Enrollment Change Form ("GVUL enrollment form"), as he was instructed to do in order to ensure that his life insurance coverage would continue.

15. Section 1 of the GVUL enrollment form is labeled "Smoker/ Non-Smoker Status Change." This section requires enrollees to select from the following status changes, "From Smoker to Non-Smoker" and "From Non-Smoker to Smoker." Smoker is defined on the form as "anyone who has used a tobacco product within the past 12 months. Tobacco use includes

3

cigarettes, cigars, pipes, chewing tobacco and snuff." (See Exhibit "A") As MR. MILLER has never been a smoker during the applicable periods, including the five-year look back periods, he logically left this section blank, as the only two options did not apply to him. MR. MILLER had never indicated to METLIFE in any form that he was a smoker, had also never agreed to any contractual term designating him as a smoker who may be charged smoker rates, and he was thus not changing his smoker status.

16. MR. MILLER also left the sections labeled "Section 2 Pilots Life Insurance Coverage Change," "Section 3 Pilot's Extra Monthly Contribution Change," and "Section 5 Spouse's Extra Monthly Contribution Change" blank, because they also did not apply to him.

17. On or about March 22, 2000, METLIFE received MR. MILLER's GVUL enrollment form. The GVUL policy itself provided that the GVUL policy coverage for enrollees such as MR. MILLER and other United pilots would take effect on June 1, 2000, and provided that METLIFE could use its discretionary power to set the insurance premium rates for enrolled pilots such as MR. MILLER. (See Exhibit "B" at B-1, B-8, indicating the policy's effective date and that METLIFE could use any reasonable method to compute Premiums due under the policy) The GVUL policy also contained a schedule of rates METLIFE could charge United pilots under the policy, dependent on age and whether the pilot was a non-smoker or smoker. (See Exhibit "B" at B-13, "Schedule of Premium Rates")   Soon thereafter, METLIFE began to charge MR. MILLER on a monthly basis for the GVUL policy as a smoker even though he had left Section 1 of the enrollment form blank and no express terms in the contract with METLIFE provided he was a smoker who may be charged smoker rates.

18. METLIFE charged MR. MILLER the smoker rate for his GVUL insurance premiums at least since his coverage began under the GVUL policy, on a continuing and

recurring monthly basis. Each year after 2000, METLIFE recalculated MR. MILLER's insurance premiums based on his ascending age bracket and the smoker rate premium corresponding to the new age bracket.

19. In or about October 2016, MR. MILLER decided to change his GVUL policy coverage because he felt he no longer needed as much coverage as he had before. In order to change his coverage, MR. MILLER accessed his policy coverage through the METLIFE Insurance link on the United Airlines Employee benefits website.

20. Once on the proper website, MR. MILLER answered a variety of questions related to his personal life and the level of coverage he desired. When entering his personal information MR. MILLER was prompted to answer the question of "Have you smoked cigarettes, pipes, or cigars or used tobacco in any form in the past 5 years?" MR. MILLER selected "NO" for his response and then proceeded to fill out the rest of the online form.

21. Once the form was completed MR. MILLER was shocked to find, when looking at the price comparison, that his monthly premium should have been drastically lower than the current amount he had been paying for the last several years. MR. MILLER quickly called METLIFE customer service to ensure he had filled out the online form correctly.

22. The METLIFE customer service agent assured MR. MILLER he had correctly filled out the online form and the reduction in premium charges was due to the fact that MR. MILLER was changing his status to a non-smoker, according to METLIFE. MR. MILLER informed the agent that he was not a smoker and that he had never been one during the applicable periods, including the five-year look back periods. The agent then informed MR. MILLER that he had been labeled as a smoker by METLIFE for purposes of GVUL coverage since his policy went into effect.

23.     MR. MILLER was obviously shocked by this information and over the course of several months contacted various METLIFE representatives, as well as union representatives from the ALPA to find out why METLIFE had charged him as a smoker for GVUL purposes and how he could be refunded for the premium overcharges he had incurred for so many years.

24.     On or about December 7, 2016, MR. MILLER received a letter from METLIFE stating, "Metropolitan Life Insurance Company has processed your request to change to non-smoking rates. Your new monthly premium is $344.92. . . .Your certificate was issued on June 1, 2000 **with smoker rates set as the default because you did not indicate your smoking status during the initial enrollment**. We cannot refund any premium difference that may have occurred back in time. A copy of your enrollment form is attached. Any other enrollment materials from 2000 are outside our document retention guidelines and no longer available." (See Exhibit "C")(Emphasis added).

25.     As a comparison MR. MILLER's last pay stub before the non-smoker status was applied shows a deduction of $420.38 for his GVUL Employee coverage. The new monthly premium of $344.92 provides MR. MILLER with the exact same level of coverage he was receiving before. This amounts to a 19.7% overcharge in premium payments being incurred on a monthly basis for an approximately 16 year period.

26.     MR. MILLER has paid his GVUL premium on time and in full, through an automatic deduction from his paycheck for the last 18 plus years. The GVUL coverage is based on a multiple of MR. MILLER's annual salary and as his salary has increased over the years, so has his GVUL coverage and thus his premiums.

27.     At this time the exact amount of overcharges on the premiums is not known but the overcharges are substantial given that they took place over a 16 year period.

28. MR. BARTON learned from MR. MILLER in or about October 2016 that METLIFE had been charging MR. MILLER smoker rates for his premiums on the GVUL policy, even though MR. MILLER had never been a smoker during the applicable periods, including the five-year look back periods.

29. After speaking to MR. MILLER, MR. BARTON became concerned that METLIFE had also been charging him smoker rates for premiums on his own GVUL policy. Thereafter, MR. BARTON discovered he too has been charged smoker rates for the premiums on his own GVUL policy, even though he has never been a smoker during the applicable periods, including the five-year look back periods.

30. Mr. BARTON then requested multiple times to a METLIFE representative that METLIFE provide him with the GVUL enrollment form he would have filled out for enrollment in his own GVUL policy. In response to his multiple requests, METLIFE did not agree to provide MR. BARTON with a copy of his GVUL enrollment form.

31. MR. BARTON never indicated to METLIFE in any form that he was a smoker, and also never agreed to any contractual term designating him as a smoker who may be charged smoker rates, because MR. BARTON has always been a non-smoker during the applicable periods, including the five-year look back periods.

32. Upon information and belief, Plaintiffs allege METLIFE overcharged similarly situated United pilots as insureds under the GVUL policy, by charging them as smokers if they failed to complete Section 1 of the GVUL enrollment form.

33. By offering the GVUL policy to United's pilots, and accepting the GVUL enrollment form as completed by the enrollees and charging and accepting the premium amount

from the insureds on a recurring basis, METLIFE entered into binding contracts with MR. MILLER, MR. BARTON, and members of the putative class.

34.     At all times mentioned herein, MR. MILLER, MR. BARTON, and all those similarly situated had never indicated to METLIFE in any form that they were smokers, had also never agreed to any contractual term designating each of them as a smoker who may be charged smoker rates, and therefore, did not select a status change for Section 1 of their GVUL enrollment form.

35.     By, assuming insureds' smoker status by default at time of enrollment, offering only the choices of "from smoker to nonsmoker" and "from nonsmoker to smoker" on the GVUL enrollment form, calculating Plaintiffs' rates as if they were smokers every year from the Schedule of Premium Rates in the GVUL policy despite no indication from enrollees they were smokers in Section 1 of the enrollment form, and no express contractual term designating them as smokers who may be charged smoker rates, METLIFE breached Exhibit 1 Schedule of Premium Rates in the GVUL policy in its contracts with MR. MILLER, MR. BARTON, and members of the putative class, as well as the term on Page 8 of the GVUL policy providing that METLIFE cannot use an unreasonable method to compute Premiums due under the GVUL policy.  Further, by charging them as smokers if they failed to complete Section 1 of the GVUL enrollment form, METLIFE misused its discretionary power under the GVUL policy and thereby breached the implied covenant of good faith and fair dealing with MR. MILLER, MR. BARTON, and members of the putative class.  METLIFE's conduct also violated the duty of good faith and fair dealing it owed Plaintiffs and members of the putative class as an insurer for this reason.

36.     METLIFE continues to breach its contracts with members of the putative class, breach the implied covenant of good faith and fair dealing, and breach the duty of good faith and fair dealing, by continuing to enforce, bill, and demand on a recurring monthly basis from its United pilot GVUL insureds a higher smoker rate premium for GVUL coverage, from Exhibit 1 Schedule of Premium Rates in the GVUL policy, even though the insureds never agreed to any contractual term designating them as smokers who may be charged smoker rates, and thus left Section 1 of the GVUL enrollment form blank.

## CLASS ACTION ALLEGATIONS

37.     Plaintiffs MR. MILLER and MR. BARTON bring this action on behalf of themselves and all others similarly situated, as members of the proposed California, Colorado and Nationwide plaintiff classes (collectively hereafter the "Class") defined as follows:

**California Class**:  All persons who resided in California at the time of the offer, or who currently reside in California, who entered into a contract with METLIFE in response to a Group Variable Universal Life insurance offer in replacement of their Optional Term Life or Group Universal Life policy, wherein the enrollment form provided for a change in smoker status section which was left blank, and where METLIFE charged smoker rates despite the class members never having enrolled as smokers.

**Colorado Class**:   All persons who resided in Colorado at the time of the offer, or who currently reside in Colorado, who entered into a contract with METLIFE in response to a Group Variable Universal Life insurance offer in replacement of their Optional Term Life or Group Universal Life policy, wherein the enrollment form provided for a change in smoker status section was left blank, and where METLIFE charged smoker rates despite the class members never having enrolled as smokers.

**Nationwide Class**: All persons who resided in the United States at the time of the offer, who entered into a contract with METLIFE in response to a Group Variable Universal Life insurance offer in replacement of their Optional Term Life or Group Universal Life policy, wherein the enrollment form provided for a change in smoker status section which was left blank, and where METLIFE charged smoker rates despite the class members never having enrolled as smokers.

Specifically excluded from the proposed Class are Defendants, any entities in which Defendants have a controlling interest, and the officers, directors, affiliates, legal representatives, successors, subsidiaries and/or assigns of Defendants, and any Judge who may be assigned to this matter.

38. This action is brought and may be properly maintained as a class action pursuant to the provisions of Federal Rule of Civil Procedure 23(a)(1)-(4) and 23(b)(1)-(3). This action satisfies the numerosity, typicality, adequacy, predominance and superiority requirements of those provisions.

39. [Fed. R. Civ. P. 23(a)(1)] The Class is so numerous that the individual joinder of all of its members is impractical. While the exact number and identities of Class members are unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs are informed and believe the Class includes many thousands of members.

40. [Fed. R. Civ. P. 23(a)(2)] Common questions of fact and law exist as to all members of the Class which predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary from class member to class member, and which may be determined without reference to the individual circumstances of any class member, include, but are not limited to, the following:

    A. Whether Defendant entered into valid contracts with members of the Class;

    B. Whether Defendant breached the contracts with the Class when it repeatedly charged members of the class the payment of premiums based on the smoker rate when no status change was selected by the insured on Section 1 of the Group Variable Universal Life Special Enrollment Change Form;

   C. Whether Defendant misused its discretionary power under the terms of the GVUL policy when it repeatedly charged members of the Class the payment of premiums based on the smoker rate;

   D. The nature and extent of damages and other remedies to which the conduct of Defendant entitles the Class members.

  41. [Fed. R. Civ. P. 23(a)(3)]  Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and all members of the Class have sustained injury and are facing harm arising out of Defendants' common course of conduct as complained of herein.  Each of the class members have been wrongfully charged higher life insurance premiums at the smoker rate.  The losses of each member of the Class were caused directly by Defendants' wrongful conduct as alleged herein.

  42. [Fed. R. Civ. P. 23(a)(4)] Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs have retained attorneys experienced in the prosecution of class actions, including complex consumer and mass tort litigation.

  43. [Fed. R. Civ. P. 23(b)(3)] A class action is superior to other available methods of fair and efficient adjudication of this controversy, since individual litigation of the claims of all Class members is impracticable.  Even if every Class member could afford individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous issues would proceed.  Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same complex factual issues.  By contrast, the conduct of this action as a class action, with respect to some or all of the issues presented herein, presents fewer management difficulties, conserves the

resources of the parties and of the court system, and protects the rights of each Class member. Plaintiffs therefore seek certification under Fed. R. Civ. P. 23(b)(3) for the purpose of recovering damages corresponding to Plaintiffs and the putative class's overpayment of premiums under their GVUL policies.

44. [Fed. R. Civ. P. 23(b)(1)(A)] The prosecution of separate actions by thousands of individual Class members would create the risk of inconsistent or varying adjudications with respect to, among other things, whether a valid contract existed, and if so, the terms of such contract. Plaintiffs and the putative class therefore seek certification under Fed. R. Civ. P. 23(b)(1) for the purpose of declaratory relief regarding whether METLIFE breached the provision in page 8 of the GVUL policy contract by utilizing an unreasonable method of computing premiums, and whether METLIFE breached the implied covenant of good faith and fair dealing in that contract by calculating premium rates in the manner it did.

45. [Fed. R. Civ. P. 23(b)(1)(B)] The prosecution of separate actions by individual class members would create a risk of adjudications with respect to them that would, as a practical matter, substantially impair or impede the ability of such non-party Class members to protect their interests, for example, on the issue of contract formation.

46. [Fed. R. Civ. P. 23(b)(2)] Defendants have acted or refused to act in respects generally applicable to the Class, thereby making appropriate final and injunctive relief with regard to the members of the Class as a whole.  Specifically, METLIFE has improperly charged its United pilot insureds higher smoker rates for life insurance premiums based on its designation of them as smokers, despite the Class members never having enrolled as smokers.

///

///

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**(Breach of Contract)**
**(By Plaintiffs and Putative Class Against All Defendants)**

47. Plaintiffs and the Class incorporate by reference each preceding paragraph as though fully set forth herein.

48. Plaintiffs and the Class entered into contracts with METLIFE for life insurance, pursuant to the terms and conditions of METLIFE's Group Universal Variable Life (GVUL) policy, and based on the information contained in the insured's enrollment form. (See Exhibits "A" and "B")

49. As set forth above, page 8 of the GVUL policy provides that "MetLife may use any reasonable method to compute Premiums due under this policy." A term of the GVUL policy therefore provides that MetLife may not use an unreasonable method to compute premiums due under the GVUL policy. Section 1 of the GVUL policy enrollment form provided for a smoker status change only.

50. Plaintiffs and the Class members performed all material terms required to accept the offer for insurance from METLIFE under the GVUL policy by completing all applicable sections of the GVUL enrollment form and returning the GVUL enrollment form to METLIFE.

51. Plaintiffs and the Class members performed all material terms required by the GVUL policy by making monthly premium payments.

52. METLIFE breached the contracts when it calculated Plaintiffs' and the putative class's premiums as if they were smokers every year, charged Plaintiffs and putative class members smoker rates even though the insureds never agreed to any contractual term designating them as smokers who may be charged smoker rates, and thus left Section 1 of the GVUL

enrollment form blank. Calculating the premiums of Plaintiffs and the putative class in such a manner is an unreasonable method of computing premiums, in violation of the terms set forth on page 8 of the GVUL policy providing that "MetLife may use any reasonable method to compute Premiums due under this policy." Plaintiffs and the Class should have been charged non-smoker rates pursuant to Exhibit 1 Schedule of Premium Rates in the GVUL policy, which METLIFE thus breached, because the insureds were non-smokers. Moreover, calculating insureds' premiums as if they were smokers, given the foregoing, was an unreasonable method of computing premiums in violation of the terms set forth on page 8 of the GVUL policy.

53.     MetLife continues to breach the contracts by, on a monthly basis, requiring the Class members to continue to make premium payments at higher smoker rates even though the insureds never indicated to METLIFE in any form that they were smokers, never agreed to any contractual term designating them as smokers who may be charged smoker rates, and thus left Section 1 of the GVUL enrollment form blank.  METLIFE continues to deny repayment of past overcharges.

54.     As a result of the foregoing, Plaintiffs and the Class members have been damaged in an amount to be proven at trial.

### SECOND CLAIM FOR RELIEF

### (Breach of the Implied Covenant of Good Faith and Fair Dealing (Contractual)) (By Plaintiffs and Putative Class Against All Defendants)

55.     Plaintiffs and the Class incorporate by reference each preceding paragraph as though fully set forth herein.

56.     The GVUL policy is a binding and enforceable contract.

57.     The GVUL policy includes an implied covenant that METLIFE will act in good faith and deal fairly with Plaintiffs and members of the Class.

58.     The GVUL policy provides METLIFE with discretionary power to set insurance premium rates for Plaintiffs and the member of the putative Class, with factors including the insured's age and non-smoker/smoker status.

59.     METLIFE, even if it performed under the terms of the GVUL policy, breached the implied covenant of good faith and fair dealing in the performance of the contracts by misusing its discretionary power when it charged Plaintiffs and the Class member excessive insurance premiums at smoker rates when the insureds never agreed to any contractual term designating them as smokers who may be charged smoker rates, and thus left Section 1 of the GVUL enrollment form blank.

60.     As a result of the foregoing, and as a direct and proximate result of MetLife's breach, Plaintiffs and Class members sustained damages. They significantly overpaid for insurance premiums associated with their METLIFE GVUL insurance coverage.

61.     Defendants are liable to Plaintiffs and Class members for damages in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF

**(Breach of the Duty of Good Faith and Fair Dealing (Tortious))**
**(By Plaintiffs and Putative Class Against All Defendants)**

62.     Plaintiffs and the Class incorporate by reference each preceding paragraph as though fully set forth herein.

63.     The GVUL policy is a binding and enforceable insurance contract.

64.     The GVUL policy includes a duty that METLIFE as an insurer will act in good faith and deal fairly with Plaintiffs and members of the Class, and METLIFE thus owed such a duty to Plaintiffs and members of the Class.

65. The GVUL policy provides METLIFE with discretionary power to set insurance premium rates for Plaintiffs and the member of the putative Class, with factors including the insured's age and non-smoker/smoker status.

66. METLIFE, even if it performed under the terms of the GVUL policy, breached the duty of good faith and fair dealing by misusing its discretionary power when it charged Plaintiffs and the Class member excessive insurance premiums at smoker rates when the insureds never agreed to any contractual term designating them as smokers who may be charged smoker rates, and left Section 1 of the GVUL enrollment form blank.           .

67. As a direct and proximate result of MetLife's breach, Plaintiffs and Class members sustained damages. They significantly overpaid for insurance premiums associated with their METLIFE GVUL insurance coverage.

68. Defendants are liable to Plaintiffs and Class members for damages in an amount to be proven at trial.

69. Moreover, because Defendants acted wantonly, maliciously, oppressively, recklessly, deliberately, and with intent, Defendants' conduct warrants substantial punitive and exemplary damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

### (Negligence)

**(By Plaintiffs and the Putative Class Against All Defendants)**

70. Plaintiffs and the Class incorporate by reference each preceding paragraph as though fully set forth herein.

71. In light of the fact that insureds never agreed to any contractual term designating them as smokers who may be charged smoker rates, and left Section 1 of the GVUL enrollment

form blank, METLIFE breached its duty of exercising ordinary care by giving insureds two choices on its GVUL enrollment form - "from nonsmoker to smoker" and "from smoker to nonsmoker" – and by calculating Plaintiffs and the Class members' premium rates as if they were smokers every year, even though the insureds never agreed to any contractual term designating them as smokers and left Section 1 of the GVUL enrollment form blank.

72. As a direct and proximate result of MetLife's breach, Plaintiffs and Class members sustained damages. They significantly overpaid for insurance premiums associated with their METLIFE GVUL insurance coverage.

73. Defendants are liable to Plaintiffs and Class members for damages in an amount to be proven at trial.

74. Moreover, because Defendants acted wantonly, maliciously, oppressively, recklessly, deliberately, and with intent, Defendants' conduct warrants substantial punitive and exemplary damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, each individually and on behalf of all other persons similarly situated, pray for judgment against METLIFE as follows:

1. An Order certifying the Class and any sub-classes thereof that the Court may deem appropriate, and appointing Plaintiffs DALE MILLER and JOHN F. BARTON, JR., and their counsel, to represent the Class;

2. An award of general damages according to proof;

3. Injunctive relief;

4. Attorneys' fees;

5. Exemplary and punitive damages;

6. Costs of suit; and

7. Any other relief the Court deems proper.

DATED: January 4, 2019

Respectfully submitted,

KIRTLAND & PACKARD LLP

By: /s/ *Joshua A. Fields*
Michael Louis Kelly (Admitted *Pro Hac Vice*)
mlk@kirtlandpackard.com
Behram V. Parakh (Admitted *Pro Hac Vice*)
bvp@kirtlandpackard.com
Joshua A. Fields (Admitted *Pro Hac Vice*)
jf@kirtlandpackard.com
1638 South Pacific Coast Highway
Redondo Beach, California 90277
Tel: (310) 536-1000
Fax: (310) 536-1001

*And*
NAPOLI SHKOLNIK PLLC
Hunter Shkolnik (HS4854)
Salvatore Badala (SB1587)
Andrew Dressel (Admitted *Pro Hac Vice*)
360 Lexington Avenue, 11th Floor
New York, New York 10017
Tel: (212) 397-1000
Fax: (646) 843-7603
Email: Hunter@NapoliLaw.com
SBadala@NapoliLaw.com
ADressel@NapoliLaw.com

*Counsel for Plaintiffs*
*Dale Miller, John F. Barton, Jr.*
*and all others similarly situated.*